NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX**

DDRA CAPITAL, INC. and John K.
BALDWIN,

                     Plaintiffs,

v.

KPMG, LLP,

                     Defendant.

Civ. No. 04-0158

OPINION

THOMPSON, U.S.D.J.[1]

## I. INTRODUCTION

This matter is before the Court upon Plaintiffs' motions for partial summary judgment.

(Docket No. 201).  The Court has decided the matter upon consideration of the parties' written

submissions and oral arguments.  For the reasons set forth below, the Court will deny Plaintiffs'

motion.

## II. BACKGROUND

*A. Factual Background*

*a. The Parties*

(1). KPMG LLP

KPMG LLP ("Defendant") is a Delaware limited liability partnership that provides public

accounting services.  (Docket No. 201, Plaintiffs' Statement of Material Facts, ¶ 5; Docket No.

---

[1] The Hon. Anne E. Thompson, United States District Court Judge for the District of New Jersey, sitting
by designation.

217, Defendant's Response to Plaintiffs' Statement of Material Facts, ¶ 5).[2]  From 1996 through 2002, KPMG developed, promoted, and implemented unregistered and fraudulent tax shelters.[3] (Docket No. 201, Plaintiffs' Exhibit F- Deferred Prosecution Agreement, ¶ 2).  One of these fraudulent tax shelters was called the Short Option Strategy ("SOS").  (Docket No. 324, Plaintiffs' Supplemental Statement of Material Facts, ¶ 14; Defendant's Response to Plaintiffs' Supplemental Statement of Material Facts, ¶ 14).  On August 11, 2000, the IRS issued Notice 2000-44, which identified SOS as a listed transaction.  (Docket No. 324, Plaintiffs' Supplemental Statement of Material Facts, ¶ 28; Defendant's Response to Plaintiffs' Supplemental Statement of Material Facts, ¶ 28).  This identification meant that losses generated by SOS would not be allowable under the Internal Revenue Code.  (*Id*.).

---

[2] Because many of the exhibits in this case were filed under seal several years ago, the Court will refer to the parties' submission by docket entry and title.

[3] On August 26, 2005, Defendant entered into a Deferred Prosecution Agreement ("DPA") with the United States Attorney's Office for the Southern District of New York.  (Docket No. 201, Plaintiffs' Exhibit F- Deferred Prosecution Agreement).  The DPA included the following acknowledgment:

> KPMG admits and accepts that . . . through the conduct of certain KPMG tax leaders, partners, and employees, during the period from 1996 through 2002, KPMG:
> Assisted high net worth United States citizens to evade United States individual income taxes on billions of dollars in capital gain and ordinary income by developing, promoting and implementing unregistered and fraudulent tax shelters.  A number of KPMG tax partners engaged in conduct that was unlawful and fraudulent, including:
> (i) preparing false and fraudulent tax returns for shelter clients;
> (ii) drafting false and fraudulent proposed factual recitations and representations as part of the documentation underlying the shelters;
> (iii) issuing opinions that contained those false and fraudulent statements and that purported to rely upon those representations, although the KPMG tax partners and the high net worth clients knew they were not true;
> (iv) actively taking steps to conceal from the IRS these shelters and the true facts regarding them; and
> (v) impeding the IRS by knowingly failing to locate and product all documents called for by IRS summonses and misrepresenting to the IRS the nature and extent of KMPG's role with respect to certain shelters.

(*Id*. at ¶ 2).

<u>(2). DDRA Capital, Inc.</u>

Plaintiff DDRA Capital, Inc. ("DDRA") is a Nevada Corporation.  (Docket No. 201, Plaintiffs' Statement of Material Facts, ¶ 1; Docket No. 217, Defendant's Response to Plaintiffs' Statement of Material Facts ¶ 1).  DDRA began its existence as Delta Downs Racing Association, Inc.  (*Id*.).  On or about June 1, 2001, Delta Downs Racing Association, Inc. changed its name to DDRA Capital, Inc.  (*Id*.).  On or about October 1, 2002, DDRA Capital, Inc., organized under the laws of Louisiana, merged into DDRA Capital, Inc., organized under the laws of Nevada.  (*Id*.).  Shawn Scott was the president and sole shareholder of DDRA.  (*Id*.). Scott is a businessman who has built up a net worth exceeding $100 million through a variety of business ventures.  (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A283, Scott 5/22/10 tr. at 103:12-21).

<u>(3). Plaintiff Baldwin</u>

Plaintiff Baldwin, until 2003, was a resident of the State of Nevada.  (Docket No. 201, Plaintiffs' Statement of Material Facts, ¶ 4; Docket No. 217, Defendant's Response to Plaintiffs' Statement of Material Facts, ¶ 4).  At the time of the filing of this Complaint, Baldwin was a resident of the United States Virgin Islands.  (*Id*.).  Baldwin is the sole member of Sunset Management LLC ("Sunset"), a limited liability corporation organized under the laws of the State of Nevada.  (Docket No. 10 at  ¶ 8).  Baldwin is a businessman who has built up a net worth exceeding $100 million through a variety of business ventures.  (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A283, Scott 5/22/10 tr. at 103:12-21).

*b. The Delta Downs Racetrack*

In 1997, the State of Louisiana passed legislation authorizing Calcasieu Parish to permit, by public referendum, operation of slot machines at horse racing facilities. (Docket No. 201, Plaintiffs' Statement of Material Facts, ¶ 54; Docket No. 217, Defendant's Response to Plaintiffs' Statement of Material Facts, ¶ 54). Delta Downs Racetrack was the horse racing facility in Calcasieu Parish affected by the new legislation. (*Id*.). In May of 1999, Plaintiff DDRA and two other entities purchased the Delta Downs Racetrack for $10 million. (Docket No. 201, Plaintiffs' Statement of Material Facts, ¶ 2; Docket No. 217, Defendant's Response to Plaintiffs' Statement of Material Facts, ¶ 2). The three entities that purchased Delta Downs Racetrack were all owned by Scott and a business partner. (Docket No. 201, Plaintiffs' Statement of Material Facts, ¶ 3; Docket No. 217, Defendant's Response to Plaintiffs' Statement of Material Facts, ¶ 3). Scott later purchased his partner's interest in the three entities and became the sole owner of the entities holding Delta Downs Racetrack. (*Id*.).

In November of 1999, Calcasieu Parish held a public referendum to determine whether slot machines could be operated at the Delta Downs Racetrack facility. (Docket No. 201, Plaintiffs' Statement of Material Facts, ¶ 55; Docket No. 217, Defendant's Response to Plaintiffs' Statement of Material Facts, ¶ 55). The referendum passed, authorizing the operation of slot machines at Delta Downs Racetrack. (*Id*.).

In early 2001, DDRA began to explore the possibility of selling Delta Downs Racetrack. (Docket No. 201, Plaintiffs' Statement of Material Facts, ¶ 58; Docket No. 217, Defendant's Response to Plaintiffs' Statement of Material Facts, ¶ 58). On April 26, 2001, Scott entered into an Asset Purchase Agreement to sell the Delta Downs Racetrack for $125 million. (Docket No. 314, Defendant's Statement of Material Facts, ¶ 17; Docket No. 324, Plaintiffs' Response to

Defendant's Statement of Material Facts, ¶ 17).  The sale of the Delta Downs Racetrack closed on May 31, 2001.  (Docket No. 314, Defendant's Statement of Material Facts, ¶ 18; Docket No. 324, Plaintiffs' Response to Defendant's Statement of Material Facts, ¶ 18).  Sunset Management LLC (Plaintiff Baldwin is the sole owner of Sunset) a lender to DDRA, also realized substantial income as a result of the sale of the racetrack from the payment of accrued interest, late charges, and exit fees.  (Docket No. 10 at ¶ 29).

   c. *Plaintiffs Consider Different Approaches to Minimize the Taxes Due on Profits from the Sale of the Racetrack*

   Plaintiffs considered different methods to minimize the taxes that would be due on profits from the sale of the race track, including proposals from the three tax firms discussed below.[4] (Docket No. 10 at ¶ 29).

<u>(1). Cornerstone Strategic Advisors LLC</u>

   Plaintiffs held meetings with representatives from the tax firm Cornerstone Strategic Advisors LLC ("Cornerstone").  (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A233, Scott 6/11/07 tr. at 78: 12-19).  Cornerstone proposed a method for limiting the income taxes due on the profits from the sale of the racetrack. (*Id*.).  Scott stated that, during Plaintiffs' meetings with Cornerstone, Plaintiffs were accompanied by Jerry Mottern (Plaintiffs' CPA), "[a]nd probably David Jensen, [Plaintiffs'] other CPA, who handled the day-to-day financial issues."  (*Id*.).  Scott could not recall if the Cornerstone representatives "met with [Plaintiffs'] attorney, Phil Murphy" who was also working with Plaintiffs on considering the proposal from Cornerstone, "but they may have." (*Id*.).

---

[4] Plaintiff Baldwin also read accounting articles and spoke with the authors of several accounting articles. (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A69, Baldwin 6/6/07 tr. at 54: 13-19).

### (2). The Heritage Group

Plaintiffs also met with representatives from The Heritage Group ("Heritage"). (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A234, Scott 6/11/07 tr. at 81: 1-22). Heritage proposed a method for Plaintiffs to limit the income taxes due on the profits from the sale of the racetrack. (*Id*.). Scott stated that, during Plaintiffs' meetings with Heritage, Plaintiffs were probably accompanied by Jerry Mottern and Dave Jensen (Plaintiffs' CPAs). (*Id*.). Scott could not recall if Heritage representatives met with Plaintiffs' attorney, Phil Murphy. (*Id*.).

### (3). KPMG LLP

Plaintiffs had meetings with Defendant KPMG. (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A135, Baldwin 12/17/09 tr. at 161: 1-22). Plaintiffs met with Carl Hasting, an employee of Defendant KPMG. (*Id*.). Hasting suggested that Plaintiffs utilize SOS to minimize their taxes. (*Id*.). SOS was designed to generate substantial ordinary or capital loss through the creation of an artificially high basis in an interest in a partnership or other entity through a series of purchases and sales of offsetting options on foreign currency. (Docket No. 201, Plaintiffs' Statement of Material Facts, ¶ 20; Docket No. 217, Defendant's Response to Plaintiffs' Statement of Material Facts, ¶ 20). Hasting described SOS as the "Rolls Royce" of tax strategies. (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A135, Baldwin 12/17/09 tr. at 161: 1-22). Defendant knew when it presented SOS to Plaintiffs that if the IRS learned of Defendant's SOS clients it would disallow all associated losses claimed by the clients on their tax returns. (Docket No. 324, Plaintiffs' Supplemental Statement of Material Facts, ¶ 100; Defendant's Response to Plaintiffs' Supplemental Statement of Material Facts, ¶ 100).

During Plaintiffs' initial meeting with Defendant, Plaintiffs were accompanied by Jerry Mottern (Plaintiffs' CPA), Dave Jensen (Plaintiffs' CPA), and Phil Murphy (Plaintiffs' attorney). Plaintiffs' accountants and lawyers researched and considered Defendant's SOS product. (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A303, Scott 5/22/10 tr. at 185: 1-22).

### d. Plaintiffs' Utilization of SOS

Plaintiffs ultimately decided to purchase and utilize Defendant's SOS tax product on their 2001 tax returns.  Reflecting on his decision to purchase SOS, Scott stated that he "thought the government would have no problem with [SOS] if KPMG was recommending it."  (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A303, Scott 5/22/10 tr. at 184: 1-22).  Scott further stated that he thought "KPMG wouldn't recommend something the government didn't like or was against."  (*Id.*).

To memorialize Plaintiffs' decision to utilize Defendant's SOS product, Plaintiffs received engagement letters from Defendant that were dated October 22, 2001.  (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment,

A715-26).  Both engagement letters contained the following language:

> KPMG shall be obligated only for services specified in this engagement letter.  Should KPMG encounter issues of circumstances that are beyond the scope of this engagement, we will notify you of such circumstances as they arise and will not incur additional expenses without your prior consent.  Unless expressly provided for, KPMG's services do not include representing you in the event of a challenge by the IRS or other tax or revenue authorities.  KPMG will not issue a tax opinion letter to you under this engagement, but will facilitate issuance of an opinion letter by legal counsel.
>
> \*       \*       \*
>
> This engagement letter covers consulting services for which you seek our advice and consultation, both written and oral, from October 15, 2001 through December 31, 2002.  KPMG understands that you intend to purchase investments from Gramercy Advisors, LLC ("Gramercy").  The following paragraph contains representation that you make to KPMG regarding said investments.
>
> You may realize either profits or losses based upon the price movement of the investments.  You have informed us that no one has provided you with any assurances or guarantees that you will make money in any of these transactions on a pre-tax or after-tax basis.  You acknowledge that you are at all times subject to market risks for both reward and loss.  We recommend that you seek independent advice concerning the investment aspects of the proposed transaction before agreeing to participate in the transactions.  You have independently determined that there is a reasonable opportunity for you to earn a reasonable pre-tax profit from the investments in excess of all associated fees and costs, and this determination has been confirmed by Gramercy.

(Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A715-16, A721-22).  Plaintiff Baldwin signed the KPMG engagement letter on November 13, 2001 and Scott signed the KPMG engagement letter on November 11, 2001.  (*Id.*).

During depositions, Plaintiff Baldwin acknowledged that part of the KPMG engagement letter was not true.  Specifically, at the time Plaintiff Baldwin signed the KPMG engagement letter, Plaintiff Baldwin had not independently determined that there was a reasonable opportunity to earn a "reasonable pre-tax profit from the investments in excess of all associated fees and costs" and Plaintiff Baldwin had not confirmed the opportunity to earn a reasonable

profit with Gramercy.  (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's

Motion for Summary Judgment, A184, Baldwin 12/18/2009 tr. at 83-4).

      In addition, Hasting stated to Plaintiffs that the SOS transaction needed to have a

legitimate business purpose.[5]  (Docket No. 203, Appendix of Exhibits Filed in Support of

Defendant's Motion for Summary Judgment, A169, Baldwin 12/18/09 tr. 25:1-14).  During

depositions, Plaintiffs agreed that their primary motivation for purchasing SOS was to minimize

their taxes.[6]  (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for

Summary Judgment, A180, Baldwin 12/18/09 Dep. 68-9).

---

[5] Plaintiff Baldwin stated the following during his deposition:

> Carl [Hasting] did say that a transaction, you know, the kind of business - - the kind of
> thing that he was proposing needed to have a business purpose.  It needed to be
> something that had - - that made money or more likely than not would make money just
> like any business.  He likened it to saying okay, if you go – you know, you go open a 7-
> Eleven, you don't know that it's going to make money, but you open it with the
> anticipation that it's going to make money, and these investments had to have that
> element as well.

(Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment,

A169, Baldwin 12/18/09 tr. 25:1-14).

[6] Plaintiff Baldwin stated the following during his deposition:

> Defense Counsel: Was it your desire to take advantage of one of those programs that
> enabled rich people to not pay taxes?
> Baldwin: Yes
> Defense Counsel: Okay.  And was it your desire to be in a posture where, like, you know,
> other wealthy people you wouldn't have to pay taxes?
> Baldwin: Yes, as long as it was legal and there was [sic] no problems with it, I wanted to
> do the same.

(Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment,

A180, Baldwin 12/18/09 Dep. 68-9).  Scott stated the following during his deposition:

> Defense Counsel: Okay.  At the time you understood that there was going to be a sale of
> the Delta Downs Racetrack, did you undertake some tax planning?
> Scott: Yes.
> Defense Counsel: And the end result of that tax planning was the transaction that's the
> issue in this case; correct?
> Scott: Yes

Plaintiffs relied on Hasting to carry out the implementation of SOS. (Docket No. 201, Plaintiffs' Statement of Material Facts, ¶¶ 91, 94; Docket No. 217, Defendant's Response to Plaintiffs' Statement of Material Facts, ¶¶ 91, 94). Baldwin paid Defendant $1,540,000.00 to execute SOS. (Docket No. 201, Plaintiffs' Statement of Material Facts, ¶ 101; Docket No. 217, Defendant's Response to Plaintiffs' Statement of Material Facts, ¶ 101). After Hasting executed SOS for Plaintiff Baldwin, Plaintiff Baldwin listed a loss of $21,999,107.00 on the 2001 tax returns for Sunset Management. (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A204-05, Baldwin 12/18/09 tr. at 162-69). In his deposition, Plaintiff Baldwin acknowledged that Sunset Management did not actually experience a loss of $21,999,107.00 in 2001 as a result of the transactions related to SOS. (*Id*.). Plaintiff DDRA paid Defendant $3,360,000.00 to execute SOS. (Docket No. 201, Plaintiffs' Statement of Material Facts, ¶ 100; Docket No. 217, Defendant's Response to Plaintiffs' Statement of Material Facts, ¶ 100). After Hasting executed SOS for Plaintiff DDRA, Plaintiff DDRA listed a loss of $47,907,020.00 on its 2001 tax returns. (Docket No. 203, Ex. A, Scott 5/23/10 tr. at 409:16-410:16).

---

Defense Counsel: And explain for me what was the reason or what motivated you to do that transaction.

Scott: Largely my – my faith that Carl Hasting and KPMG would look out for our interests.

Defense Counsel: But what were you trying to accomplish through the transaction?

Scott: Well, we wanted to minimize our tax that we would have to pay to the extent the law allowed us to do so.

Defense Counsel: So tax minimization is what you were looking to accomplish; correct?

Scott: Yes

(Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A279, Scott 5/22/10 Dep. 87).

On February 15, 2002, Plaintiffs each received an opinion letter, analyzing the legality of SOS from the law firm De Castro, West, Chodorow, Glickfield & Nass, Inc. ("De Castro").  The De Castro opinion letters stated "there is greater than 50 percent likelihood that [SOS] would be upheld if challenged by the IRS."  (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A 728, 813).  The De Castro opinion letters also contained the following disclaimer:

> The analysis and conclusions contained herein are not binding on the IRS, or any other agency, administrative body or court.  There is no assurance that the IRS will not take one or more positions contrary to one or more of the opinions expressed herein, or succeed in taking any such positions.  Our opinion should not be considered a representation, warranty, or guarantee that such taxing authority or such court will concur with our opinion, in whole or in part.  This opinion is based upon our view of the federal law as of the date of this opinion.  Any change to the applicable law (for which we shall have no responsibility to advise you) may result in our opinion being rendered invalid or necessitate a reconsideration of our opinion.  Moreover, there is no assurance that the IRS will not challenge, perhaps successfully, the facts upon which the opinions expressed herein are based.  This opinion is for your benefit solely and may be relied upon only by you.

(*Id*. at A737, A802).  Plaintiffs each signed representation letters, drafted by De Castro, acknowledging that the IRS may not agree with the tax position taken in De Castro's opinion letter and that the IRS might prevail in any challenge.  (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A1100-04).

Defense Counsel deposed Plaintiffs' expert witness in this case, Brant Hellwig, and asked questions about SOS.  In response to a question about whether SOS was too good to be true,

Hellwig stated the following:

> To me, it seems like this transaction would strike anybody as producing a result that would be too good to be true.  And I'll qualify that by saying that there is also a view out there that these too good to be true transactions are available if you have the right sophisticated advisors.

(*Id*. at C151).

### e. The IRS Challenge of Plaintiffs' Taxes

On May 10, 2004, Defendant contacted Plaintiffs because the IRS had compelled

Defendant to turn over the identities of the individuals who bought SOS.  (Docket No. 324,

Plaintiffs' Supplemental Statement of Material Facts, ¶ 150; Defendant's Response to Plaintiffs'

Supplemental Statement of Material Facts, ¶ 150).  On May 13, 2004, Defendant informed

Plaintiffs that SOS was targeted by the IRS as a listed transaction under Notice 2000-44.

(Docket No. 324, Plaintiffs' Supplemental Statement of Material Facts, ¶ 156; Defendant's

Response to Plaintiffs' Supplemental Statement of Material Facts, ¶ 156).  In 2005, Plaintiffs

entered into closing agreements with the IRS agreeing to pay taxes, penalties and interest for the

2001 tax year. [7]  (Docket No. 324, Plaintiffs' Supplemental Statement of Material Facts, ¶¶ 162-

3; Defendant's Response to Plaintiffs' Supplemental Statement of Material Facts, ¶¶ 162-3).

---

[7] Plaintiff Baldwin entered into a closing agreement with the IRS which resulted in his paying
$10,698,603.96, representing $8,554,685.00 in tax, $855,468.50 in penalties, and $1,288,449.96 in
interest for the 2001 tax year.  (Docket No. 324, Plaintiffs' Supplemental Statement of Material Facts, ¶¶
162-3; Defendant's Response to Plaintiffs' Supplemental Statement of Material Facts, ¶¶ 162-3).  Plaintiff
DDRA was assessed $22,162,059.01 by the IRS, representing $17,121,602.00 in tax, $1,712,160.20 in
penalties, and $3,328,297.01 in interest, for its 2001 tax year.  (*Id*.).

Based on the foregoing allegations, Plaintiffs assert the following claims for relief:

(1) Breach of Fiduciary Duty;

(2) Fraud;

(3) Negligent Misrepresentation;

(4) Negligence;

(5) Violation of 18 U.S.C. § 1962 (c);

(6) Violation of 18 U.S.C. § 1962 (d);

(7) Restitution;

(8) Federal Securities Fraud; and

(9) Securities Fraud in Violation of the Nevada Statute.

(Docket No. 10).

### B. Procedural History

This action was commenced on December 7, 2004 by the filing of a Complaint in the District Court for the District of the Virgin Islands.  The Chief Judge for the District of the Virgin Islands reassigned this case to Judge Thompson on November 15, 2013.  (Docket No. 327).   Plaintiffs' motion for partial summary judgment, filed on March 15, 2011, is the subject of this opinion.  (Docket No. 201).

## III.  DISCUSSION

### A. Legal Standard

On a motion for summary judgment, the moving party will prevail if it establishes that there is no genuine issue as to any material fact and it is entitled to judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986) (existence of a factual dispute will not defeat summary judgment; rather, the dispute must be genuine and the

fact must be material); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A question of fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B. Analysis

Plaintiffs' partial motion for summary judgment claims that Plaintiffs are entitled to summary judgment as to Counts One through Five of their Complaint.  The Court will address each count in the order they are addressed in Plaintiffs' brief.

#### Count Two: Fraud

Under Nevada law, a Plaintiff can bring a fraud claim under two alternative theories: (1) based on a defendant's affirmative misrepresentation; or (2) based on a defendant's omission of a material fact.  Plaintiffs claim that they are entitled to summary judgment as to Count Two of their Complaint under both theories of fraud.  The Court will analyze Plaintiffs' motion for summary judgment under each theory.

##### (1) Fraud by affirmative misrepresentation

To sustain a claim for fraud by affirmative representation under Nevada law, a plaintiff

must prove the following elements:

> (1) a false representation made by the defendant;
> (2) defendant's knowledge or belief that the representation is false (or insufficient basis for making the representation);
> (3) defendant's intention to induce the plaintiff to act or to refrain from acting in reliance upon the misrepresentation;
> (4) plaintiff's justifiable reliance upon the misrepresentation; and
> (5) damage to the plaintiff resulting from such reliance.

*Nevada Power Co. v. Monsanto Co.*, 891 F. Supp. 1406, 1413-14 (D. Nev. 1995)(citing

*Bulbman, Inc. v. Nevada Bell,* 108 Nev. 105 (1992).[8]

 Here, Plaintiffs have not met their burden on a motion for summary judgment with respect to the fourth element: justifiable reliance. As defined in Nevada, "justifiable reliance" in a fraud case exists when the misrepresentation played a "material and substantial part in leading the plaintiff to adopt his particular course." *Blanchard v. Blanchard*, 108 Nev. 908, 911 (1992) (quoting *Lubbe v. Barba,* 91 Nev. 596, 600 (1975)). Whether a plaintiff's reliance on a misrepresentation is justified is generally a question of fact. *See id.* (citing *Epperson v. Roloff*, 102 Nev. 206, 210 (1986)).

---

[8] At oral argument, all parties agreed that Nevada law controls in this case. Below is Defendant's summary of why Nevada law controls in this case:

> In determining choice of law here, and pursuant to the conflicts of laws rules of the Virgin Islands, this Court should apply the "local law of the state which … has the most significant relationship to the occurrence and the parties." Restatement (Second) Conflict of Laws § 145; 1 V.I.C. § 4; *Berry v. American Airlines, Inc.,* 2000 U.S. Dist. LEXIS 13101, at *3 (D.V.I. Aug. 28, 2000) (B. 26-27) (Restatement (Second) Conflicts of Laws applies in the Virgin Islands). Here, the law of Nevada should apply, because: (i) most of the meetings between Plaintiffs and KPMG took place in Nevada (A. 79-80 [Baldwin Tr. 93-97]; A. 234-35 [Scott Tr. 84-86] A. 300-01 [Scott Tr. 173-76]); (ii) Plaintiffs received relevant correspondence in Nevada (A. 715 [DDRA Eng. Ltr.]; A. 721 [Baldwin Eng. Ltr.]; A. 727 [De Castro Ltr. to Mr. Baldwin, at 1]; A. 801 [De Castro Ltr. to DDRA at 1]); and (iii) Plaintiffs reflected Nevada addresses on the tax returns relevant to this matter. (A. 876 (DDRA); A. 897 (Mr. Baldwin).) Indeed, Plaintiffs alleged a Nevada securities fraud claim. (A. 27-28 [2d Amd. Cmpt. ¶¶ 132-37].) To the extent the Court concludes that California law applies to this action instead, the law of California and Nevada are substantially identical as to the issues raised in this Motion.

(Docket No. 203 at 12, n. 9).

When analyzing justifiable reliance, Nevada law imputes to the plaintiff the knowledge of any agent or employee who obtained information "while acting in the course of his employment and within the scope of his authority," *In re Agribiotech, Inc.*, CV S 02 0537 PMP, 2005 WL 4122738, at 12* (D. Nev. Apr. 1, 2005)(quoting *Strohecker v. Mut. Bldg. & Loan Ass'n of Las Vegas*, 55 Nev. 350 (1934)), and charges a plaintiff with knowledge of the documents he receives, *Yee v. Weiss*, 110 Nev. 657, 662 (1994).

Here, Plaintiffs allege that Defendant told them the SOS transaction was lawful and would be upheld by the IRS.  However, Plaintiffs received documents indicating the potential illegality of SOS.  The KPMG engagement letter, De Castro representation letter, and the De Castro opinion letter all suggested that the IRS might challenge the SOS transaction.  KPMG's engagement letter contained the following disclaimer: "KPMG's services do not include representing you in the event of a challenge by the IRS or other tax or revenue authorities." (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A715-16, A721-22).  The De Castro opinion letter contained the following language:

> The analysis and conclusions contained herein are not binding on the IRS, or any other agency, administrative body or court.  There is no assurance that the IRS will not take one or more positions contrary to one or more of the opinions expressed herein, or succeed in taking any such positions.  Our opinion should not be considered a representation, warranty, or guarantee that such taxing authority or such court will concur with our opinion, in whole or in part.

(*Id*. at A737, A802).  Plaintiffs signed representation letters, drafted by De Castro, acknowledging that the IRS may not agree with the tax position taken in the De Castro opinion letter and that the IRS might prevail in any challenge.  (*Id*. at A1100-04).

In addition, under Nevada law, reliance is not justifiable if the plaintiff has "information which would serve as a danger signal . . . to any normal person of his intelligence and

experience." *Collins v. Burns*, 103 Nev. 394, 397 (1987). Here, there were danger signals suggesting the potential illegality of SOS.

First, Plaintiffs' engagement letter with KPMG contained a false statement. Plaintiffs' engagement letters with KPMG contained the following language: "You have independently determined that there is a reasonable opportunity for you to earn a reasonable pre-tax profit from the investments in excess of all associated fees and costs, and this determination has been confirmed by Gramercy." (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A715-16, A721-22). During deposition, Plaintiff Baldwin acknowledged that this part of the KPMG engagement letter was not true. At the time Plaintiff Baldwin signed the KPMG engagement letter, Plaintiff Baldwin had not independently determined that there was a reasonable opportunity to earn a "reasonable pre-tax profit from the investments in excess of all associated fees and costs" and Plaintiff Baldwin had not confirmed the opportunity to earn a reasonable profit with Gramercy. (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A184, Baldwin 12/18/2009 tr. at 83-4).[9]

---

[9] Plaintiff Baldwin stated the following during his deposition:

> Defense Counsel: Now, if you can turn to page 2 for a second, it then says in the next sentence, you have independently determined that there is a reasonable opportunity for you to earn a reasonable pretax profit from the investments in excess of all associated fees and costs and this determination has been confirmed by Gramercy. Had you at the time you signed this letter independently determined that there was a reasonable opportunity for you to earn a reasonable pretax profit for the investment in excess of all associated fees and costs?
> Baldwin: No.
> Defense Counsel: And had you had that determination confirmed by Gramercy?
> Baldwin: No.

(Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A184, Baldwin 12/18/09 Dep. 83-4).

Second, the amount of money Plaintiffs paid to execute SOS and the resulting figures Plaintiffs listed on their tax returns could have signaled the potential illegality of SOS.  Plaintiff Baldwin paid Defendant $1,540,000.00 to execute SOS.  (Docket No. 201, Plaintiffs' Statement of Material Facts, ¶ 101; Docket No. 217, Defendant's Response to Plaintiffs' Statement of Material Facts, ¶ 101).  After Defendant executed SOS for Plaintiff Baldwin, Plaintiff Baldwin listed a loss of $21,999,107.00 on the 2001 tax returns for Sunset Management.  (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A204-05, Baldwin 12/18/09 tr. at 162-69).  Plaintiff DDRA paid Defendant $3,360,000.00 to execute SOS.  (Docket No. 201, Plaintiffs' Statement of Material Facts, ¶ 100; Docket No. 217, Defendant's Response to Plaintiffs' Statement of Material Facts, ¶ 100).  After Defendant utilized SOS for Plaintiff DDRA, Plaintiff DDRA listed a loss of $47,907,020.00 on its 2001 tax returns. (Docket No. 203, Ex. A, Scott 5/23/10 at 409:16-410:16).  Plaintiffs' own expert stated "it seems like this transaction would strike anybody as producing a result that would be too good to be true."  (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, C151).

Third, after Hasting executed SOS for Plaintiff Baldwin, Plaintiff Baldwin listed a loss of $21,999,107.00 on the 2001 tax returns for Sunset Management.  (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A204-05, Baldwin 12/18/09 tr. at 162-69).  In his deposition, Plaintiff Baldwin acknowledged that Sunset Management did not actually experience a loss of $21,999,107.00 in 2001 as a result of the transactions related to SOS.  (*Id*.).

Given the danger signals suggesting the potential illegality of SOS and the documents suggesting the IRS might challenge the SOS transaction, Plaintiffs have not met their burden on

a motion for summary judgment with respect to the fourth element of fraud: justifiable reliance.

Therefore, Plaintiffs' motion for summary judgment, with respect to their claim of fraud by

affirmative misrepresentation, will be denied.

<u>(2) Fraud by Omission of a Material Fact</u>

To sustain a claim for fraud by omission of a material fact under Nevada law, a plaintiff

must prove the following elements:

> (1) the defendant must have concealed or suppressed a material fact;
> (2) the defendant must have been under a duty to disclose the fact to the plaintiff;
> (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, that is, he must have concealed or suppressed the fact for the purpose of inducing the plaintiff to act differently than he would if he knew the fact;
> (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact;
> (5) and, finally, as a result of the concealment or suppression of the fact, the plaintiff must have sustained damages.

*Nevada Power Co.*, 891 F. Supp. at 1415.

Here, Plaintiffs have not met their burden on a motion for summary judgment with

respect to the second element: whether Defendant was under a duty to disclose material facts to

Plaintiff.   A duty to disclose material facts arises with the existence of a special relationship

where "one reposes a special confidence in another so that the latter, in equity and good

conscience, is bound to act in good faith and with due regard to the interests of the one reposing

the confidence."  *Butcher v. Advanced Mineral Technologies, Inc.*, 2:10-CV-01802-PMP, 2011

WL 810256, *4 (D. Nev. Mar. 2, 2011) (citing *Long v. Towne*, 98 Nev. 11, 13 (1982));

*Mackintosh v. Jack Matthews & Co.*, 109 Nev. 628, 633 (1993); *Nev. Power Co.*, 891 F. Supp. at

1416.

Ordinarily, an arms-length contractual relationship will not support a finding of a

fiduciary or confidential relationship.  *Butcher*, 2:10-CV-01802-PMP, 2011 WL 810256, *4

(citing *Executive Mgmt., Ltd. v. Ticor Title Ins. Co.*, 114 Nev. 823, 841 (1998)).  *See also Star Patrol Enterprises, Inc. v. Saban Entm't, Inc.*, 129 F.3d 127 (9th Cir. 1997).  The relationship between two parties becomes confidential only when it involves an additional element that makes it more intimate than an arms-length transaction, such as existing kinship, professional, business, or social relationships between the parties.  *Perry v. Jordan*, 111 Nev. 943, 947 (1995).

Here, the record could support a finding that Defendant and Plaintiffs engaged in an arms-length transaction.  The record supports a finding that Hasting's role, on behalf of Defendant, was that of a salesman selling a tax product to a willing buyer.[10]  Plaintiffs considered Defendant's tax product, SOS, along with other tax minimization options offered by Heritage and Cornerstone.  (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A233, A234, Scott 6/11/07 tr. at 78: 12-19, 81: 1-22).  Plaintiffs only decided to use Defendant's tax product after consulting at length with their own attorneys and accountants.  (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A303, Scott 5/22/10 tr. at 185: 1-22).

Furthermore, each Plaintiff agreed in the KPMG engagement letter that "KPMG shall be obligated only for services specified in this engagement letter."  (Docket No. 203, Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment, A720 DDRA Engagement Letter, A726 Baldwin Engagement Letter).  Defendant did not agree to act as Plaintiffs'

---

[10] Minnesota courts that have encountered this question have found as a matter of law that no fiduciary relationship exists between an investor seeking a tax shelter and the accountant who sold the shelter. In *Midland Nat'l Bank of Minneapolis v. Perranoski,* plaintiffs brought a breach of fiduciary duty claim arising out of a failed tax shelter. 299 N.W.2d 404, 409 (Minn. 1980).  The plaintiffs had discussed the transaction with other advisors and failed to read legally binding documents that disclosed the nature of the transaction before signing them.  *Id.* at 413.  The court held that, given the circumstances, the accountant was merely "a salesman selling an investment interest to a willing buyer." *Id.*

fiduciary.  Instead, Defendant only agreed "to provide tax consulting services, and personal

financial planning."  (*Id.*).  KPMG and the Plaintiffs further agreed that each was an

"Independent Contractor":

> It is understood and agreed that each of the parties hereto is an independent
> contractor and that neither party is, nor shall be considered to be, an agent, partner
> or joint venturer of the other. Neither party shall act or represent itself, directly or
> by implication, as an agent of the other or in any manner assume or create any
> obligation on behalf of, or in the name of, the other.

(*Id*. at 6).[11]

Plaintiffs have not met their burden on a motion for summary judgment with respect to

the fourth element of fraud by omission of a material fact.  Therefore, Plaintiffs' motion for

summary judgment, with respect to Plaintiffs' claim for fraud by omission of a material fact, will

be denied.

### Count Five: Violation of 18 U.S.C. § 1962(c)

To sustain a cause of action under 18 U.S.C. § 1962 (c), a plaintiff must prove the

following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering

activity."  *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004).  *See also Sedima, S.P.R.L. v.

Imrex Co., Inc.,* 473 U.S. 479, 496 (1985).

Here, Plaintiffs have not met their burden on a motion for summary judgment with

respect to the third element: whether Defendant engaged in a *pattern* of racketeering activity.  A

pattern of racketeering activity requires at least two predicate acts of racketeering.  *Lum*, 361

F.3d at 223.  Plaintiffs allege that Defendant committed predicate acts of fraud.  Because

---

[11] Courts in other jurisdictions have held that independent contractors are not fiduciaries. *See Schulman v.
Wolske & Blue Co., L.P.A.*, 125 Ohio App. 3d 365, 372 (1998)(there is generally no fiduciary relationship
or duty between an independent contractor and his employer unless both parties understand that the
relationship is one of special trust and confidence).

Plaintiffs are not entitled to summary judgment with respect to their fraud claims, Plaintiffs also

are not entitled to summary judgment with respect to their claims under 18 U.S.C. § 1962 (c).

### *Count One: Breach of Fiduciary Duty*

To sustain a claim for breach of fiduciary duty, a plaintiff must show "the existence of a

fiduciary duty, the breach of that duty, and that the breach proximately caused damages." *Brown*

*v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1245 (D. Nev. 2008)(citing *Giles v. Gen.*

*Motors Acceptance Corp.,* 494 F.3d 865, 880–81 (9th Cir.2007) (applying Nevada law).  Here,

Plaintiffs have not met their burden on a motion for summary judgment with respect to the first

element: whether Defendant owed Plaintiffs a fiduciary duty.

Under Nevada law, "a fiduciary relationship exists when one has the right to expect trust

and confidence in the integrity and fidelity of another." *Powers v. United Servs. Auto. Ass'n*, 115

Nev. 38, 42 (1999).  As discussed above, an arms-length contractual relationship will ordinarily

not support a finding of a fiduciary or confidential relationship.  *Butcher*, 2:10-CV-01802-PMP,

2011 WL 810256, *4.

Thus, for the same reasons set forth above, Plaintiffs have not met their burden on a

motion for summary judgment with respect to the issue of whether a fiduciary relationship

existed between Plaintiffs and Defendant.  Therefore, Plaintiffs' motion for summary judgment,

with respect to Plaintiffs' claim for breach of fiduciary duty, will be denied.

### *Count Three: Negligent Misrepresentation*

To sustain a claim for negligent misrepresentation under Nevada law, a plaintiff must

prove the following:

> (1) a representation that is false;
> (2) that the representation was made in the course of the defendant's business or in any action in which he has a pecuniary interest;
> (3) the representation was for the guidance of others in their business transactions;
> (4) the representation was justifiably relied upon;
> (5) that such reliance resulted in pecuniary loss to the relying party; and
> (6) that the defendant failed to exercise reasonable care or competence in obtaining or communicating the information.

*G.K. Las Vegas Ltd. P'ship v. Simon Prop. Grp., Inc.*, 460 F. Supp. 2d 1246, 1262 (D. Nev. 2006). Here, for the same reasons discussed above, Plaintiffs have not met their burden on a motion for summary judgment with respect to the fourth element: justifiable reliance. Therefore, Plaintiffs' motion for summary judgment, with respect to their claim for negligent misrepresentation, will be denied.

> <u>Count Four: Negligence</u>

To sustain a claim for negligence under Nevada law, a plaintiff must prove the following:

> (1) that the defendant owed the plaintiff a duty of care;
> (2) that the defendant breached that duty;
> (3) the breach of that duty caused harm to the plaintiff that was reasonably foreseeable; and
> (4) damages.

*Butler ex rel. Biller v. Bayer*, 123 Nev. 450, 464 (2007). Here, Plaintiffs have not met their burden on a motion for summary judgment with respect to the first element: Defendant's duty to Plaintiffs.

In Nevada, "[i]t is well settled that the standard of care must be determined by expert testimony unless the conduct involved is within the common knowledge of laypersons." *Daniel, Mann, Johnson & Mendenhall v. Hilton Hotels Corp.*, 98 Nev. 113, 115 (1982); *Bronneke v. Rutherford*, 120 Nev. 230, 238 (2004)("The jury, as general laypersons, would not know the customary practice in the profession.").

Here, Plaintiffs offer no expert testimony to establish the duty of care in this matter, and thus, have not met their burden for summary judgment.  Accordingly, Plaintiffs' motion for summary judgment will be denied with respect to their claim for negligence.

## IV.  CONCLUSION

For the reasons set forth above, Plaintiffs' motion will be denied.  An appropriate order will follow.

*/s/ Anne E. Thompson*
ANNE E. THOMPSON, U.S.D.J.

Date:  4/29/14